1  Paul Alan Levy (DC Bar 946400)
   Scott Michelman (Bar No. 236574)
2  Email: smichelman@citizen.org
   Public Citizen Litigation Group
3  1600 20th Street NW
   Washington, D.C.  20009
4  Telephone: 202/588-1000
   Facsimile:  202/588-7795
5
   Aden J. Fine (Bar No. 186728)
6  Email: afine@aclu.org
   American Civil Liberties Union Foundation
7  125 Broad St., 18th Floor
   New York, New York 10004
8  Telephone: 212/549-2693
   Facsimile: 212/549-2654
9
   Matthew Zimmerman (Bar No. 212423)
10 Email:  mattz@eff.org
   Electronic Frontier Foundation
11 454 Shotwell Street
   San Francisco, Caloifornia 94110
12 Telephone: 415/436-9333 x127
   Facsimile: 415/436-9993
13
   Attorneys for Amici Curiae
14

15

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

16  RON PAUL 2012 PRESIDENTIAL CAMPAIGN  )   No. CV-12-0240-MEJ
    COMMITTEE, INC., a Delaware Corporation,  )
17                                             )   **MEMORANDUM OF**
                        Plaintiff,             )   **PUBLIC CITIZEN, AMERICAN**
18                                             )   **CIVIL LIBERTIES UNION,**
                                               )   **ELECTRONIC FRONTIER**
19                                             )   **FOUNDATION AND DIGITAL**
                   v.                          )   **MEDIA LAW PROJECT AS**
20                                             )   **AMICI CURIAE ADDRESSING**
                                               )   **THE PROPER STANDARD FOR**
21  DOES 1-10, INCLUSIVE,                      )   **EARLY DISCOVERY TO**
                                               )   **IDENTIFY ANONYMOUS**
22                      Defendants.            )   **SPEAKERS**

23                          **TABLE OF CONTENTS**

24  Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

25  Interest of Amici Curiae . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

26  Summary of Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

27  ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

28

1    A.    The Constitution Limits Compelled Identification of Anonymous Internet Speakers.. . . . . 4

2    B.    The Qualified Privilege for Anonymous Speech Supports a Five-Part Standard for
           Identification of Doe Defendants That Demands Showings, Not Just Allegations, and
3          a Balancing of Interests. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

4    C.    Plaintiff Has Not Followed the Steps Required Before Identification of the John Doe
           Speakers May Be Ordered in This Case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
5
           1.    Plaintiff Has Not Given Does Notice of This Motion. . . . . . . . . . . . . . . . . . . . 13
6
           2.    Plaintiff Has Specified the Words Over Which It Is Suing the Does.. . . . . . . . . . 14
7
           3.    Plaintiff's Complaint Does Not Meet a Motion to Dismiss Standard.. . . . . . . . . 14
8
           4.    Plaintiff Has Not Produced Sufficient Evidence to Show That It Can
9                Succeed on the Merits of Its Claim... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

10         5.    The Balance of Interests Tips Decidedly in the Does' Favor. .. . . . . . . . . . . . . . 19

11   D.    The Court Should Address Plaintiff's Failure to Cite Contrary Authority In Arguing
           for Early Discovery, Which Was Improper in the Context of an Ex Parte Motion. . . . . . 21
12
     Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-ii-

**TABLE OF AUTHORITIES**

**CASES**

*Alvis Coatings v. Does,*
    2004 WL 2904405 (W.D.N.C. Dec. 2, 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Anonymous Online Speakers v. United States District Court,*
    661 F.3d 1168 (9th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9, 10

*Art of Living v. Does 1-10,*
    2011 WL 5444622 (N.D. Cal. Nov. 9, 2011).. . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9, 10

*In re Baxter,*
    2001 WL 34806203 (W.D. La. Dec. 20, 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Best Western Int'l v. Doe,*
    2006 WL 2091695 (D. Ariz. July 25, 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Bosley Medical Group v. Kremer,*
    403 F.3d 672 (9th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Branch v. Tunnell,*
    14 F.3d 449 (9th Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Bursey v. United States,*
    466 F.2d 1059 (9th Cir. 1972). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Cedar Crest Health Center v. Bowen,*
    129 F.R.D. 519 (S.D. Ind. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Columbia Insurance Co. v. Seescandy.com,*
    185 F.R.D. 573 (N.D. Cal. 1999).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 9, 13

*Dendrite International v. Doe,*
    775 A.2d 756 (N.J. App. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Doe v. 2theMart.com,*
    140 F. Supp. 2d 1088 (W.D. Wash. 2001).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Doe v. Cahill,*
    884 A.2d 451 (Del. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 11, 12

*Doe I and II v. Individuals whose true names are unknown,*
    561 F. Supp.2d 249 (D. Conn. 2008).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*In re Does 1-10,*
    242 S.W.3d 805 (Tex. App. 2007).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

-iii-

*Eagan by Keith v. Jackson*,
    855 F. Supp. 765 (E.D. Pa. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Ealy v. Littlejohn*,
    569 F.2d 219 (5th Cir. 1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*FEC v. Florida for Kennedy Committee*,
    681 F.2d 1281 (11th Cir. 1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Fodor v. Doe*,
    2011 WL 1629572 (D. Nev. April 27, 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Global Telemedia Int'l v. Doe 1*,
    132 F. Supp. 2d 1261 (C.D. Cal. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Harte-Hanks Communications v. Connaughton*,
    491 U.S. 657 (1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Highfields Capital Management v. Doe*,
    385 F. Supp. 2d 969 (N.D. Cal. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8, 10, 18

*Howell by Goerdt v. Tribune Entertainment Co.*,
    106 F.3d 215 (7th Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Incorp Services v. Does 1-10*,
    2011 WL 5444789 (N.D. Cal. Nov. 9, 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Independent Newspapers v. Brodie*,
    966 A.2d 432 (Md. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Interstate National Gas Co. v. Southern California Gas Co.*,
    209 F.2d 380 (9th Cir. 1953). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Jack Russell Terrier Network of Northern Cal. v. American Kennel Club*,
    407 F.3d 1027 (9th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Jones v. Flowers*,
    547 U.S. 220 (2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Jorgenson v. County of Volusia*,
    846 F.2d 1350 (11th Cir. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Koch Industries v. Doe*,
    2011 WL 1775765 (D. Utah May 9, 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Krinsky v. Doe 6*,
    72 Cal. Rptr.3d 231 (Cal. App. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Maine Audubon Soc. v. Purslow*,
    907 F.2d 265 (1st Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Maxon v. Ottawa Publ'g Co.*,
    929 N.E.2d 666 (Ill. App. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

-iv-

*McIntyre v. Ohio Electric Cmsn.*,
514 U.S. 334 (1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5

*McMann v. Doe*,
460 F. Supp. 2d 259 (D. Mass. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Menzies v. Doe*,
194 F.3d 174 (D.C. Cir 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Missouri ex rel. Classic III v. Ely*,
954 S.W.2d 650 (Mo. App. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Mobilisa v. Doe*,
170 P.3d 712 (Ariz. App. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Mortgage Specialists v. Implode-Explode Heavy Industries*,
999 A.2d 184 (N.H. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*New York Times v. Sullivan*,
374 U.S. 254 (1964). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18

*Noble Resources Pte. v. Metinvest Holding*,
622 F. Supp. 2d 77 (S.D.N.Y. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*O'Connor v. Superior Court*,
223 Cal. Rptr. 357 (Cal. App. 1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15

*Openmind Solutions v. Does 1-39*,
2011 WL 4715200 (N.D. Cal. Aug. 23, 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Parrino v. FHP, Inc.*,
146 F.3d 699 (9th Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Pilchesky v. Gatelli*,
12 A.3d 430 (Pa. Super. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*SaleHoo Group v. Doe*,
722 F. Supp. 2d 1210 (W.D. Wash. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Sandoz Pharmaceuticals Corp. v. Richardson-Vicks*,
902 F.2d 222 (3d Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Sinclair v. TubeSockTedD*,
596 F. Supp. 2d 128 (D.D.C. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Software & Information Industrial Association v. Solers*,
No. 10-CV1523 (D.C. App. Jan. 12,  2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Solano v. Playgirl*,
292 F.3d 1078 (9th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Solers v. Doe*,
977 A.2d 941 (D.C. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

-v-

*Southland Sod Farms v. Stover Seed Co.*,
    108 F.3d 1134 (9th Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Steam Press Holdings v. Teamsters Local 996*,
    302 F.3d 998 (9th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*USA Technologies v. Doe*,
    713 F. Supp. 2d 901 (N.D. Cal. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*U.S. v. Toader*,
    582 F. Supp. 2d 987 (N.D. Ill. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Wakefield v. Thompson*,
    177 F.3d 1160 (9th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

**LEGISLATIVE MATERIALS AND RULES**

Lanham Act,
    15 U.S.C. §§ 1051 *et seq.*

    Section 43(a), 15 U.S.C. § 1125(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
    Section 43(a)(1), 15 U.S.C. § 1125(a)(1).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
    Section 43(a)(1)(B), 15 U.S.C. § 1125(a)(1)(B). . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

135 Cong. Rec. H1207, H1217 (April 13, 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

**MISCELLANEOUS**

*Lessig, The Law of the Horse: What Cyber Law Might Teach*,
    113 HARV. L. REV. 501, 504-505 (1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Levy, *Litigating Civil Subpoenas to Identify Anonymous Internet Speakers*,
    ABA Litigation Section, LITIGATION, Vol. 37, No. 3 (Spring 2011).. . . . . . . . . . . . . . . 13

-vi-

1   This case involves an issue which, until this week, had been addressed consistently in the

2   Northern District of California, as well as by state appellate courts and federal trial courts across the

3   country: What procedures apply, and what showings are required, when a plaintiff asserts a claim for

4   defamation or some other wrong based on anonymous online speech and seeks to identify the

5   anonymous speaker?  Based on the well-accepted First Amendment right to speak anonymously, and

6   recognizing that First Amendment rights cannot be infringed without a compelling state interest,

7   before subpoenas to identify anonymous speakers are permitted, courts across the country insist that

8   anonymous would-be defendants must be notified of the threat to their First Amendment right to speak

9   anonymously and that would-be plaintiffs must make both a legal and an evidentiary showing of merit

10  before government power may be deployed to identify anonymous critics.  The courts then balance

11  the interests of the plaintiff in securing relief from genuine harm based on a real violation of his rights,

12  and of the defendant in remaining anonymous.

13  Plaintiff Ron Paul 2012 Presidential Campaign Committee ("Paul Committee") has sued

14  anonymous Internet bloggers over a YouTube video that denounces Jon Huntsman, formerly a rival

15  candidate for the Republican presidential nomination.  The gist of the video is that Huntsman is "weak

16  on China" because he speaks Mandarin and has adopted Chinese children; in one particularly vicious

17  moment, the video raises a question about whether Hunstman really adopted those children.  The

18  video closes with a screen that reads

19                              American Values and Liberty
                                Vote Ron Paul
20
    and was posted under the pseudonym NHLiberty4Paul.  The video can be viewed on YouTube at
21
    http://www.youtube.com/user/NHLiberty4Paul/videos.  Paul Committee's lawsuit contends that Mr.
22
    Paul never authorized the use of his name on the video, and that authorization was, in fact, required
23
    because members of the public will assume that Paul Committee issued the video.  Consequently, Paul
24
    Committee alleges that the posting infringes the common law trademark in his name (Count I), is false
25
    advertising (Count II), and defames him (Count III).
26
    Shortly after filing the complaint, plaintiff moved for leave to take early discovery, citing a
27

28

series of decisions in which courts have allowed pro se prisoners suing over mistreatment at the hands of police or prison officers to use discovery to identify officers named only as Doe defendants, as well as a few unreported orders allowing discovery to identify anonymous defendants who used file-sharing software to download copyrighted sound recordings.   But plaintiff made no mention of well-established precedent in state and federal courts throughout the United States, including in this district, that requires a court to balance a plaintiff's interest in proceeding with a valid lawsuit against the First Amendment right of anonymous speakers to retain their anonymity by requiring plaintiffs to produce evidence—not mere allegations in a complaint—showing that there is a realistic chance that the lawsuit will be successful.   Amici, who have played a leading role in developing the national consensus standard regarding the test for identifying anonymous Internet speakers, and have also been deeply involved in cases involving claims of trademark infringement as well as defamation, submit this brief to explain why the motion was properly denied but to urge the Court to clarify its January 25 order setting the standard that will apply to future attempts to pursue discovery, both for the benefit of the parties here and to maintain a uniform standard in this district.

## INTEREST OF AMICI CURIAE

As more fully set forth in the motion for leave to file as amici curiae, Public Citizen is a consumer advocacy organization, the Digital Media Law Project is an organization dedicated to providing education and legal resources for online speakers, and the ACLU and Electronic Frontier Foundation are civil liberties organizations.   Amici work on a range of issues, including the right of Internet users to speak anonymously so long as they have done no wrong.   Since the turn of the century, amici have sought to encourage the development of First Amendment precedent requiring courts to cast a skeptical eye on subpoenas that seek to compel the identification of anonymous Internet speakers, and they have been involved in many of the major cases in which the standard for deciding whether to allow or to enforce such subpoenas has been established.   Amici have also been involved in many cases in which Internet critics have been improperly sued for trademark violations simply because they used the names of companies about which they wanted to express their views. This experience makes amici uniquely well equipped to explain why and how this Court should clarify

-2-

1    the standards for unmasking anonymous online critics of public figures and why this particular motion

2    for early discovery was properly denied.

3                                    **SUMMARY OF ARGUMENT**

4           Federal and state courts throughout the country have applied well-accepted First Amendment

5    principles to cases such as this one by following the so-called *Dendrite*[1] test to decide when to allow

6    discovery to identify anonymous Internet speakers.  Under that test, which has repeatedly been

7    endorsed by district judges in this District, anonymous would-be defendants must be notified of the

8    threat to their First Amendment right to speak anonymously, would-be plaintiffs must make both a

9    legal and an evidentiary showing of merit before government power may be deployed to identify

10   anonymous critics, and the court must balance the interests of the plaintiff in securing relief from

11   genuine harm based on a real violation of his rights, and of the defendant in remaining anonymous.

12          The principal advantage of the *Dendrite* test is its flexibility.  It balances the interests of the

13   plaintiff who claims to have been wronged against the interest in anonymity of the Internet speaker

14   who claims to have done no wrong.  In that way, it provides for a preliminary determination based on

15   a case-by-case, individualized assessment of the equities.  It avoids creating a false dichotomy between

16   protection for anonymity and the right of victims to be compensated for their harms.  It ensures that

17   online speakers who engage in flagrant infringement of intellectual property rights or who make

18   actionable statements about public figures, companies, or private individuals will not be immune from

19   identification and from legal responsibility.  At the same time, the standard helps ensure that persons

20   with legitimate reasons for using others' intellectual property, or for criticizing public figures, will be

21   allowed to maintain the secrecy of their identity as the First Amendment allows.

22          The *Dendrite* test also has the advantage of discouraging lawsuits whose real objective is the

23   "outing" of anonymous speakers.  In the first few years of the Internet, thousands of lawsuits were

24   filed seeking to identify online speakers, and enforcement of subpoenas was almost automatic.

25   Internet Service Providers ("ISPs") reported staggering statistics about the number of subpoenas they

26

27   [1]      *Dendrite Int'l v. Doe*, 775 A.2d 756 (N.J. App. 2001).

28                                              -3-

1    received.  Although no firm numbers can be cited, experience leads amici to believe that the number

2    of suits being filed to identify online speakers dropped after *Dendrite* was decided.  Decisions that

3    adopted strict legal and evidentiary standards for defendant identification sent a signal to would-be

4    plaintiffs and their counsel to stop and think before they sue.  At the same time, the identification of

5    many online speakers, and publicity about verdicts against formerly anonymous defendants,

6    discouraged some would-be posters from indulging in the sort of Wild West behavior that once

7    prevailed.

8           There is a particular need to apply a test protective of anonymous speech in this case, because

9    the speech at issue—commentary on the presidential candidacy of a former governor and ambassador,

10   and advocacy of a Congressman's presidential candidacy—is pure political speech, which is at the

11   core of the protections of the First Amendment.  Given the intensity of media and blogger scrutiny of

12   those who speak during elections, the speakers may well worry about the consequences of having

13   made a video that managed to offend two different candidates for President.  Moreover, in light of

14   statements that Paul Committee has made about the video—suggesting that the Huntsman campaign

15   issued the video itself in order to seek sympathy for its candidate while casting aspersions on Mr.

16   Paul—identification of the Does is likely to be just the beginning of a court-compelled inquisition into

17   the Does' motives and political ties.  Citizens should not have to pay so high a price for having

18   expressed views about candidates for the office of President of the United States.

19                                              **ARGUMENT**

20   **A.    The Constitution Limits Compelled Identification of Anonymous Internet**
     **Speakers.**

21

22   The Supreme Court holds that the First Amendment protects the right to speak anonymously:

23       [A]n author is generally free to decide whether or not to disclose his or her true
         identity.  The decision in favor of anonymity may be motivated by fear of economic
         or official retaliation, by concern about social ostracism, or merely by a desire to
24       preserve as much of one's privacy as possible.  Whatever the motivation may be . . .
         the interest in having anonymous works enter the marketplace of ideas unquestionably
25       outweighs any public interest in requiring disclosure as a condition of entry.
         Accordingly, **an author's decision to remain anonymous, like other decisions**
26       **concerning omissions or additions to the content of a publication, is an aspect of**
         **the freedom of speech protected by the First Amendment**.

27                                              * * *

28                                               -4-

Under our Constitution, anonymous pamphleteering is not a pernicious, fraudulent practice, but an honorable tradition of advocacy and of dissent.

*McIntyre v. Ohio Elec. Comm'n*, 514 U.S. 334, 341-342, 356 (1995) (emphasis added).

Internet speakers may choose to speak anonymously for a variety of reasons. They may wish to avoid having their views stereotyped according to their racial, ethnic or class characteristics, or their gender. They may be associated with an organization but want to express an opinion of their own, without running the risk that, despite the standard disclaimer against attribution of opinions to the group, readers will assume that the group feels the same way. They may want to say or imply things about themselves that they are unwilling to disclose otherwise. And they may wish to say things that might make other people angry and stir a desire for retaliation.

Although the Internet allows anonymous communication, it creates an unparalleled capacity to monitor every speaker and to discover his or her identity. Because of the Internet's technology, any speaker who sends an e-mail or visits a website leaves an electronic footprint that, if saved by the recipient, starts a path that can be traced back to the original sender. *See* Lessig, *The Law of the Horse: What Cyber Law Might Teach*, 113 HARV. L. REV. 501, 504-505 (1999). Thus, anybody with enough time, resources and interest, if coupled with the power to compel disclosure of the information, can learn who is saying what to whom. To avoid the Big Brother implications of unlimited enforcement of such power to uncover the identities of anonymous Internet speakers who have done nothing but exercise their First Amendment rights, the law must allow such subpoenas only where the party seeking disclosure can make some evidentiary showing that the lawsuit has actual merit, and when the balance of the parties' interests warrants such disclosure.

The courts have recognized the serious chilling effect that subpoenas seeking to identify anonymous speakers can have on dissenters and the First Amendment interests that are implicated by such subpoenas. *E.g.*, *FEC v. Florida for Kennedy Committee*, 681 F.2d 1281, 1284-1285 (11th Cir. 1982); *Ealy v. Littlejohn*, 569 F.2d 219, 226-230 (5th Cir. 1978); *Bursey v. United States*, 466 F.2d 1059, 1084-1086 (9th Cir. 1972). As one court said in refusing to order identification of anonymous Internet speakers whose identities were allegedly relevant to the defense against a

-5-

shareholder derivative suit, "If Internet users could be stripped of that anonymity by a civil subpoena enforced under the liberal rules of civil discovery, this would have a significant chilling effect on Internet communications and thus on basic First Amendment rights."  *Doe v. 2theMart.com*, 140 F. Supp.2d 1088, 1093 (W.D. Wash. 2001).  Courts in this district have written along the same lines:

> People are permitted to interact pseudonymously and anonymously with each other so long as those acts are not in violation of the law.  This ability to speak one's mind without the burden of the other party knowing all the facts about one's identity can foster open communication and robust debate. . . .  **People who have committed no wrong should be able to participate online without fear that someone who wishes to harass or embarrass them can file a frivolous lawsuit and thereby gain the power of the court's order to discover their identities**.

*Columbia Insurance Co. v. Seescandy.com*, 185 F.R.D. 573, 578 (N.D. Cal. 1999) (emphasis added).

**B.    The Qualified Privilege for Anonymous Speech Supports a Five-Part Standard for Identification of Doe Defendants That Demands Showings, Not Just Allegations, and a Balancing of Interests.**

Amici fully appreciate and support the line of appellate cases cited by plaintiff in its motion for leave to take early discovery; these cases allow pro se prisoners to use discovery to identify police officers or prison personnel who participate in activities that violate the prisoner's civil rights, but who often cannot be identified before suit is filed.  Similarly, it is not uncommon for litigants bringing non-constitutional tort claims, such as those arising out of workplace injuries, to require discovery to identify the maker of the machine that injured them.  But in those cases, there is no significant legal interest that is violated by an identification order, and hence discovery in those cases is fairly routine. Even when no speech is involved, the Ninth Circuit decision cited by plaintiff's ex parte motion (at 4) denies discovery when "it is clear that the complaint would be dismissed on other grounds." *Wakefield v. Thompson*, 177 F.3d 1160, 1163 (9th Cir. 1999).

But the First Amendment right to speak anonymously, and the danger of a chilling effect if the mere filing of a notice-pleading complaint is a ticket to identify the plaintiff's critics, have led courts to recognize that the mere fact that a plaintiff has filed a lawsuit over particular speech does not create a compelling government interest in taking away the defendant's anonymity. The challenge for courts is to find a standard that makes it neither too easy nor too hard to identify anonymous

-6-

1  speakers. Setting the bar "too low will chill potential posters from exercising their First Amendment

2  right to speak anonymously. The possibility of losing anonymity in a future lawsuit could intimidate

3  anonymous posters into self-censoring their comments or simply not commenting at all." *Doe v.*

4  *Cahill*, 884 A.2d 451, 457 (Del. 2005). Yet setting the bar too high will make it impossible for

5  plaintiffs with perfectly valid claims to identify wrongdoers and proceed with their cases.

6  Court have drawn on the media's privilege against revealing sources in civil cases to enunciate

7  a similar rule protecting against the identification of anonymous Internet speakers. The leading

8  decision on this subject, *Dendrite v. Doe*, 775 A.2d 756 (N.J. App. 2001), which has been embraced

9  by several district judges in the Northern District of California, established a five-part standard that

10  has been followed or adapted throughout the country:

11      1.  Give Notice: Courts require the plaintiff (and sometimes the ISP) to provide
12          reasonable notice to the potential defendants and an opportunity for them to defend
          their anonymity before issuance of any subpoena.

13      2.  Require Specificity: Courts require the plaintiff to allege with specificity the
          speech or conduct that has allegedly violated its rights.
14

15      3.  Ensure Facial Validity: Courts review each claim in the complaint to ensure
          that it states a cause of action upon which relief may be granted based on each
          statement and against each defendant.
16

17      4.  Require An Evidentiary Showing: Courts require the plaintiff to produce
          evidence supporting each element of its claims.
18

19      5.  Balance the Equities: Weigh the potential harm (if any) to the plaintiff from
          being unable to proceed against the harm to the defendant from losing the First
          Amendment right to anonymity.

20  *Id.* at 760-61.

21  Several cases in this district followed *Dendrite* strictly; until this Court's ruling on the ex parte

22  motion, no case in this district had ever applied a motion to dismiss standard, rather than a higher

23  standard, to decide whether to identify an anonymous noncommercial speaker accused of denigrating

24  the plaintiff. The leading opinion was authored by Magistrate Judge Wayne Brazil in *Highfields*

25  *Capital Mgmt. v. Doe*, 385 F. Supp.2d 969, 976 (N.D. Cal. 2005), and adopted by Judge Chesney.

26  That case involved postings on a Yahoo! message board about Highfields, the largest shareholder in

27  a company called Silicon Graphics ("SGI") , including a number of comments that purported to be

28                                                          -7-

1   authored by Highfields, in a context mocking both Highfields and SGI.  Highfields's complaint cited

2   various theories of defamation, commercial disparagement, and unfair competition, as well as a

3   variety of state and federal trademark claims, but the court refused to allow discovery to identify the

4   anonymous posters.  Judge Brazil's opinion squarely endorsed the *Dendrite* analysis and held that

5   there was insufficient evidence of likely confusion, of false statements of fact, or of damage to the

6   plaintiff.  *Id.* at 977-989.  But even if there had been some proof of wrongdoing, Judge Brazil

7   recommended quashing the subpoena because there was little reason to believe that any possibly

8   wrongful conduct had harmed the plaintiff and because the right to post anonymous criticisms of

9   publicly traded companies was too important to be sacrificed in such a case; consequently, the balance

10   of harms tipped decidedly in favor of retaining anonymity.  *Highfields* was followed by *USA*

11   *Technologies v. Doe*, 713 F. Supp.2d 901 (N.D. Cal. 2010), where the plaintiff claimed both

12   defamation and federal securities law violations.

13        Most recently, in *Art of Living v. Does 1-10,* 2011 WL 5444622 (N.D. Cal. Nov. 9, 2011),

14   Magistrate Judge Lloyd initially denied application of the *Dendrite* standard because Art of Living

15   had sued for copyright infringement, and many cases about illegal downloading had, in Judge Lloyd's

16   view, created a "copyright exception" to *Dendrite.*  Judge Koh overruled Judge Lloyd's decision,

17   holding that the speech in the downloading cases is barely speech at all, but that the Does in *Art of*

18   *Living* had been sued for committing copyright infringement in the course of criticizing an

19   international religious group which was, if not political speech, comparable to political speech in its

20   degree of First Amendment protection.  Consequently, Judge Koh concluded, the nature of the Does'

21   speech commanded application of the *Highfields Capital* (and thus *Dendrite*) approach rather than

22   the more permissive standard applied in the illegal downloading cases.

23        The propriety of applying such a balancing test is confirmed by strong dictum in the Ninth

24   Circuit's decision in *Anonymous Online Speakers v. United States District Court*, 661 F.3d 1168 (9th

25   Cir. 2011).  Plaintiff there brought a variety of claims against a rival, including defamation and

26   tortious interference both with business relations and with contract.  After discovery to identify Doe

27   speakers connected with the rival was denied in part and granted in part, both sides sought mandamus.

28                                          -8-

1    Strictly speaking the Ninth Circuit's opinion does not determine the precise standard to be applied

2    in future cases because, on mandamus, the court of appeals reviews only for clear error.  However,

3    in deciding that the trial court did not commit clear error in ruling that there had been a sufficient

4    evidentiary showing and hence granting discovery into the identity of three of the defendants, the

5    Ninth Circuit said that the court below had "appropriately considered the important value of

6    anonymous speech balanced against a party's need for relevant discovery in a civil action." *Id.* at

7    1176.  Moreover, in dicta, the Court expressed approval of a heightened standard to determine when

8    discovery is appropriate to determine a speaker's identity when political speech is involved.  *Id.* at

9    1176-1177.  Although *Anonymous Online Speakers* does not hold that the requirement of proof of a

10   factual basis must be applied by district courts in the Ninth Circuit, it surely suggests that in the

11   context of the highly political speech at issue in this case, it would approve application of such a

12   requirement.

13        A pre-*Dendrite* ruling in this district also confirms the need to consider evidence.  *Columbia*

14   *Insurance Co. v. Seescandy.com*, 185 F.R.D. 573, 578 (N.D. Cal. 1999).  In that case, which was cited

15   in Wednesday's order from this Court, the claim was that the anonymous registrant of certain domain

16   names infringed the plaintiff's trademark to force plaintiff to pay for the names. *Id.* at 579.  Although

17   the opinion articulated a motion to dismiss standard, its ultimate ruling depended on the consideration

18   of evidence.  The court explained that defendant had sent the plaintiff copies of thirty-one emails that

19   defendant had received requesting plaintiff's products: "[M]ost importantly, plaintiff can show actual

20   confusion, courtesy of the 31 emails . . .. Evidence of actual confusion is strong proof of the fact of

21   likelihood of confusion. . . . Plaintiff's showing is sufficient to demonstrate that the Kumar defendants

22   have committed an unlawful act for which a federal cause of action can subsist."  *Id.* at 580

23   (punctuation and citation omitted).[2]

24

25   [2]       There was a similar disconnect between what the trial court said and what the trial court did
           in *Dendrite* itself—the judge articulated a motion to dismiss standard  (page 6 of his opinion),
26         but in fact considered evidence in denying the plaintiff's motion for leave to take early
           discovery.  (at pages 12, 13, 16, 19) (Opinion at http://cyberslapp.org/documents/Dendrite
27         SuperiorCourtOpinion.pdf).  This disconnect was one of Dendrite's arguments on appeal; the

28                                                    -9-

1    The two cases applying a motion to dismiss standard that the Court cited in its January 25

2  ruling are each very different from this case.  Those differences reveal why Judge Koh declined to use

3  those cases' motion to dismiss standard in *Art of Living*.  Both decisions were issued in response to

4  ex parte motions for early discovery to identify "anonymous Internet users" whose speech interests

5  pale by comparison to the speech interest in this case.  In *Art of Living*, Judge Koh explained that the

6  attempted equation of cases involving critics with the downloading cases is inconsistent with the

7  Ninth Circuit's determination in *Anonymous Online Speakers* that it is the nature of the speech at

8  issue that determines the proper standard for assessing early discovery to identify the speakers.

9  Allegedly displaying one's favorite songs for downloading by others, whether legal or illegal, simply

10  does not involve the sort of speech to which Judge Koh and other judges in this district have applied

11  the heightened discovery standard.

12    This Court's ruling in *Openmind Solutions v. Does 1-39*, 2011 WL 4715200, at *1 (N.D. Cal.

13  Aug. 23, 2011), addressed discovery to identify Internet users who had allegedly downloaded a movie,

14  precisely the sort of "speech" to which Judge Koh said the motion to dismiss standard had been

15  improperly applied. And *Incorp Services v. Does 1-10*, 2011 WL 5444789, at *1 (N.D. Cal. Nov. 9,

16  2011), involved a complaint that certain anonymous Internet users had engaged in click fraud,

17  repeatedly clicking on a link for the purpose of driving up the plaintiff's costs and lowering the price

18  of per-click advertising for an unknown competitor.  Plaintiff's ex parte motion referred in passing

19  to such clicks as "misrepresent[ing] that they were interested in Plaintiff's services," Dkt #7, at 4, and

20  cited only *Seescandy* and some mass downloading cases as authority for a motion to dismiss standard.

21  *Id.* at 2.  But even if clicks on commercial advertisements are speech, they are scarcely comparable

22  to the political speech at issue in this case.   Thus, the reasoning of *Anonymous Online Speakers*

23  makes *Incorp* inapposite here, for the same reason that Judge Koh found the downloading cases

24  inapposite here; this difference commands consistency with the *Highfields / Dendrite* standard that

25  other district judges have applied to cases like this one.

26

27    Appellate Division adopted a standard explicitly requiring both evidence and balancing.

28                                              -10-

Although *Dendrite* has become the majority rule around the country, and is usually applied in this District, a somewhat less exacting standard, formulated by the Delaware Supreme Court in *Cahill*, requires the submission of evidence to support the plaintiff's claims, but not an explicit balancing of interests after the evidence is deemed otherwise sufficient to support discovery. *Cahill*, 884 A.2d 451. In *Cahill*, the Delaware Superior Court had ruled that a town councilman who sued over statements attacking his fitness to hold office could identify the anonymous posters so long as he was not proceeding in bad faith and could establish that the statements about him were actionable because they might have a defamatory meaning. However, the Delaware Supreme Court ruled that a plaintiff must put forward evidence sufficient to establish a prima facie case on all elements of a defamation claim that ought to be within his control without discovery, including that the statements are false. The *Cahill* court rejected the final "balancing" stage of the *Dendrite* standard.

All of the other state appellate courts that have addressed the issue of subpoenas to identify anonymous Internet speakers have adopted some variant of the *Dendrite* or *Cahill* standard. Several courts expressly endorse the *Dendrite* test, requiring notice and an opportunity to respond, legally valid claims, evidence supporting those claims, and finally an explicit balancing of the reasons supporting disclosure and the reasons supporting continued anonymity. These decisions include:

> *Mobilisa v. Doe*, 170 P.3d 712 (Ariz. App. 2007), where a private company sought to identify the sender of an anonymous email message who had allegedly hacked into the company's computers to obtain information that was conveyed in the message. Directly following the *Dendrite* decision, and disagreeing with the Delaware Supreme Court's rejection of the balancing stage, the court analogized an order requiring identification of an anonymous speaker to a preliminary injunction against speech. The Court called for the plaintiff to present evidence sufficient to defeat a motion for summary judgment, followed by a balancing of the equities between the two sides.

> *Independent Newspapers v. Brodie*, 966 A.2d 432 (Md. 2009), where the court required notice to Doe, specification of the defamatory words in full context, prima facie showing, and, "if all else is satisfied, balanc[ing] the anonymous poster's First Amendment right of free speech against the strength of the prima facie case of defamation presented by the plaintiff and the necessity for disclosure of the anonymous defendant's identity." 966 A.2d at 457.

> *Mortgage Specialists v. Implode-Explode Heavy Industries*, 999 A.2d 184 (N.H. 2010), where a mortgage lender sought to identify the author of comments saying that its president "was caught for fraud back in 2002 for signing borrowers names and bought his way out." The New Hampshire Supreme Court held that "the *Dendrite* test is the appropriate standard by which to strike the balance between a defamation

-11-

plaintiff's right to protect its reputation and a defendant's right to exercise free speech anonymously."

*Pilchesky v. Gatelli*, 12 A.3d 430 (Pa. Super. 2011), which held that a city council chair had to meet the *Dendrite* test before she could identify constituents whose scabrous accusations included selling out her constituents, prostituting herself after having run as a reformer, and getting patronage jobs for her family.

Several other courts use a *Cahill*-like summary judgment standard.   For example:

*Krinsky v. Doe 6*, 72 Cal. Rptr.3d 231 (Cal. App. 2008), where the appellate court reversed a trial court decision allowing an executive to learn the identity of several online critics who allegedly defamed her by such references as "a management consisting of boobs, losers and crooks."

*In re Does 1-10*, 242 S.W.3d 805 (Tex. App. 2007), which reversed a decision allowing a hospital to identify employees who allegedly violated patient confidentiality and disparaged their employer through posts on a blog.

*Solers v. Doe*, 977 A.2d 941 (D.C. 2009), where the court held that a government contractor could identify an anonymous whistleblower who said that plaintiff was using unlicensed software if it produced evidence that the statement was false. The court adopted *Cahill*.  After a remand, the same court held that the plaintiff must show actual damage before the Doe can be identified. *Software & Info. Indus. Ass'n v. Solers*, No. 10-CV1523 (D.C. Jan. 12, 2012).[3/]

In addition to the cases already discussed from this District, other federal district courts have repeatedly followed *Cahill* and *Dendrite*.  *See Best Western Int'l v. Doe*, 2006 WL 2091695 (D. Ariz. July 25, 2006) (court used five-factor test drawn from *Cahill*, *Dendrite* and other decisions); *Fodor v. Doe*, 2011 WL 1629572 (D. Nev. April 27, 2011) (following *Dendrite*); *Koch Industries v. Doe*, 2011 WL 1775765 (D. Utah May 9, 2011) (rejecting discovery to identify defendants in case alleging various trademark claims, breach of contract, and violation of the Computer Fraud and Abuse Act because "'[t]he case law . . . has begun to coalesce around the basic framework of the test articulated in *Dendrite*'" (quoting *SaleHoo Group v. Doe*, 722 F. Supp.2d 1210, 1214 (W.D. Wash. 2010) (alleging trademark and defamation claims)); *In re Baxter*, 2001 WL 34806203 (W.D. La. Dec. 20, 2001) (preferred *Dendrite* approach, required showing of reasonable possibility or probability of success); *Sinclair v. TubeSockTedD*, 596 F. Supp.2d 128, 132 (D.D.C. 2009) (did not choose between

_____

[3/]    In *Maxon v. Ottawa Publ'g Co.*, 929 N.E.2d 666 (Ill. App. 2010), the Illinois Court of Appeals found it unnecessary to apply the First Amendment to a petition for pre-litigation discovery because the state's rules already required a verified complaint, specification of the defamatory words, determination that a valid claim was stated, and notice to the Doe.

-12-

1    *Cahill* and *Dendrite* because plaintiff lost under either standard); *Alvis Coatings v. Does*, 2004 WL

2    2904405 (W.D.N.C. Dec. 2, 2004) (identification allowed based on defamation and trademark claims

3    in light of detailed affidavit about how comments were false); *Doe I and II v. Individuals whose true*

4    *names are unknown*, 561 F. Supp.2d 249 (D. Conn. 2008) (identification ordered after plaintiffs

5    provided detailed affidavits showing basis for claims of defamation and intentional infliction of

6    emotional distress). *See generally* Levy, *Litigating Civil Subpoenas to Identify Anonymous Internet*

7    *Speakers*, ABA Litigation Section, LITIGATION, Vol 37, No. 3 (Spring 2011), at 27.

8         Although these cases set out slightly different standards, each requires a court to weigh the

9    plaintiff's interest in identifying the person who has allegedly violated its rights against the interests

10   implicated by the potential violation of the First Amendment right to anonymity, thus ensuring that

11   First Amendment rights are not trammeled unnecessarily.  Put another way, the qualified privilege

12   to speak anonymously requires courts to review a would-be plaintiff's claims and the evidence

13   supporting them to ensure that the plaintiff has a valid reason for piercing the speaker's anonymity

14   before that anonymity is lost.

15   **C.    Plaintiff Has Not Followed the Steps Required Before Identification of the John**
      **Doe Speakers May Be Ordered in This Case.**[4/]

16

17        **1.    Plaintiff Has Not Given Does Notice of This Motion.**

18        When courts receive requests for permission to subpoena anonymous Internet posters, they

19   should require plaintiffs to undertake efforts to notify the posters that they are the subject of

20   subpoenas, and then withhold any action for a reasonable period of time until defendants have had

21   time to retain counsel. *Columbia Ins.*, 185 F.R.D. at 579.  Thus, in *Dendrite*, the trial judge required

22   the plaintiff to post on the message board a notice of an application for discovery to identify

23   anonymous message board critics.  The notice identified the four screen names that were sought to

24   be identified, and provided information about the local bar referral service so that the individuals

25   concerned could retain counsel to voice their objections, if any.  The Appellate Division specifically

26   ───────────────────
      [4/]    Although the Court has already denied plaintiff's motion for early discovery, amici include this
27            discussion to illustrate the proper application of the national consensus standard and to explain
              why, under that standard, plaintiff's motion should have been denied.

28                                              -13-

1    approved this requirement. 775 A.2d at 760.  Indeed, notice and an opportunity to defend are

2    fundamental requirements of constitutional due process.  *Jones v. Flowers*, 547 U.S. 220 (2006).

3         Here, plaintiff has made no showing of any efforts to notify the Does that it is seeking to

4    compel their identification.  To be sure, this lawsuit has been widely publicized, and there are even

5    references to the action in the comments section of NHLiberty4Paul's channel.

6    http://www.youtube.com/user/NHLiberty4Paul/feed?filter=1 (last visited January 27, 2012).   But

7    there is no indication that the Does have been told that this motion for expedited discovery is pending

8    or that there is any deadline for opposing it.  Until such notice is given, the first step of *Dendrite* has

9    not been satisfied.

10        **2.     Plaintiff Has Specified the Words Over Which It Is Suing the Does.**

11        The second stage of the *Dendrite* test has been satisfied in this case.  It is important to require

12   the plaintiff to set out the precise words claimed to be defamatory (and the context of those words)

13   because it is often possible to determine, just from the words themselves, that no tenable claim for

14   defamation could be brought.  Here, the actionable words have been quoted verbatim in the

15   complaint, although the entire video has not been provided to the Court.  However, the video is

16   readily accessible publicly; amici are providing these URL's so that the context can be more readily

17   assessed. http://www.youtube.com/user/NHLiberty4Paul/videos;  http://www.techdirt.com/articles/

18   20120119/01493317470/what-is-ron-paul-thinking-sues-to-unmask-anonymous-internet-users.shtml.

19        **3.     Plaintiff's Complaint Does Not Meet a Motion to Dismiss Standard.**

20        Neither of the trademark counts in this case could survive a motion to dismiss.  The cause of

21   action for common law trademark infringement fails because the statute applies only to a defendant

22   who has used the trademark "in connection with a sale of goods or services."  15 U.S.C. § 1125(a)(1).

23   The Ninth Circuit has held that under this language, "trademark infringement law prevents only

24   unauthorized uses of a trademark in connection with a commercial transaction in which the trademark

25   is being used to confuse potential consumers." *Bosley Medical Group v. Kremer*, 403 F.3d 672, 676

26   (9th Cir. 2005).  The Court said that this limitation is required to keep trademark law within First

27   Amendment limits, because the ban on merely "misleading" or "confusing" speech, although perfectly

28                                        -14-

1    proper when applied with respect to commercial speech, "would be impermissible if the same

2    regulation were applied to noncommercial expressions." *Id.* at 677.  After all, a political flyer or a

3    newspaper article about a public figure could not be enjoined, or made the basis for an award of

4    damages, simply because some readers would likely find it confusing.  *O'Connor v. Superior Court*,

5    223 Cal. Rptr 357, 361 (Cal. App. 1986). Consequently, the Ninth Circuit in *Bosley* upheld the

6    dismissal of a trademark infringement action against a consumer who established a web site, using

7    the company's name as the domain name for his site, to criticize the company's products.

8         The false advertising cause of action fails because, in addition to being subject to the same

9    "in connection with a sale of goods or services," the false advertising subsection applies only to

10   misleading descriptions "in commercial advertising or promotion." 15 U.S.C. § 1125(a)(1)(B).  In

11   addition, the Ninth Circuit has held that standing to sue under this provision is available only to

12   plaintiffs who can show "(1) a commercial injury based upon a misrepresentation about a product;

13   and (2) that the injury is 'competitive,' or harmful to the plaintiff's ability to compete with the

14   defendant."  *Jack Russell Terrier Network of Northern California. v. American Kennel Club*, 407

15   F.3d 1027, 1037 (9th Cir. 2005).[5/]

16        Paul Committee's complaint does not meet these tests.   Although the complaint refers in

17   passing to the video as being a "commercial advertisement," it never alleges commercial injury—to

18   the contrary, it is only injury to Paul's electoral chances that are pleaded—and there is no allegation

19   that plaintiff competes with the defendant, or that the injury of which Paul Committee complains

20   prevents it from competing with the defendant.  Moreover, inspection of the video—which is

21

22

---

23   [5/]     In proposing the false advertising provision of the Lanham Act, the House Judiciary
24            Committee explained that it would not affect non-commercial speech:

25            [T]he proposed change in Section 43(a) should not be read in any way to limit
              political speech, **consumer** or editorial **comment**, parodies, satires, or other
26            constitutionally protected material. . . .  The section is narrowly drafted to
              encompass only clearly false and misleading commercial speech.

27            135 Cong. Rec. H1207, H1217 (April 13, 1989) (emphasis added).

28                                              -15-

1    permissible under Ninth Circuit law even on a motion to dismiss standard[6/]—belies any allegation that

2    it is commercial in any way. The video simply expresses views about the merits of two candidacies—

3    Huntsman's and Paul's.  That is simply not commercial speech, and it is outside the scope of the

4    Lanham Act.

5         Consideration of the video itself also belies the allegation in the complaint that either the

6    video or the pseudonym under which the video was posted is likely to confuse viewers into believing

7    that Paul Committee itself issued the video.  The final screen of the video simply contains the words

8    "Vote Ron Paul."  A candidate has no monopoly on the right to advocate his own election; nor can

9    he limit that right to his official campaign committee.  Put another way, although the public interest

10   in disclosure of the sources and funding of campaign related speech (where, unlike here, such an

11   interest has been asserted by Congress or the FEC) may in some circumstances overcome interests

12   in anonymous speech, Paul Committee's purely private and wholly illegitimate interest in trying to

13   control what other people say about Ron Paul's campaign and about his opponents does not.

14   Although the FEC regulates television advertising supporting candidates, it has so far not imposed

15   regulations on Internet communications by individuals (as opposed to by political committees and

16   paid internet ads).

17        Indeed, if trademark law deemed any statement of support for a candidate to be as tied to the

18   candidate as Paul Committee here alleges, then the practical effect would be to give each candidate

19   veto power over any expression of support that the candidate did not approve. Moreover, history has

20   frequently shown that candidates want to distance themselves from some of their more extreme or

21   obnoxious supporters.  If trademark law entitled a candidate to prevent expressions of support for

22   reasons of which they disapprove, future candidates would be compelled to file lawsuits against

23   supporters whose views are unpopular; otherwise, political opponents could argue that they are

24   ─────────────

[6/]    The video itself can be considered on a motion to dismiss standard because the video is alleged
25      in the complaint.  *Branch v. Tunnell*, 14 F.3d 449, 453-454 (9th Cir. 1994) ("When the
        plaintiff fails to introduce a pertinent document as part of his pleading, the defendant may
26      introduce the exhibit as part of his motion attacking the pleading.").  *Accord*, *Parrino v. FHP,
        Inc.*, 146 F.3d 699, 705-706 (9th Cir. 1998); *Interstate Nat. Gas Co. v. Southern California
27      Gas Co.*, 209 F.2d 380, 384 (9th Cir. 1953).

28                                        -16-

1    implicitly giving permission for the obnoxious support by "allowing" it to be expressed.  Such a rule,

2    therefore, would put the courts foursquare into regulating political expression in every election.

3         Once the trademark claim is rejected on its face, the court would not retain subject matter

4    jurisdiction over this case.  The only remaining claim in the case arises under state law, and although

5    the case may meet the amount in controversy requirement, there is no allegation that the citizenship

6    of the parties is diverse.  Indeed, plaintiff cannot allege the Does' citizenship, for the very reason that

7    it does not know who they are.  That inability is the reason why courts consistently hold that Does

8    may not be sued under diversity jurisdiction.  *Menzies v. Doe*, 194 F.3d 174 (D.C. Cir. 1999) (mem.);

9    *Howell by Goerdt v. Tribune Entertainment Co.*, 106 F.3d 215, 218 (7th Cir. 1997); *McMann v. Doe*,

10   460 F.Supp.2d 259, 264 (D. Mass. 2006).  Without being certain that it has jurisdiction to consider

11   the defamation claim, the Court should not take away the Does' First Amendment right to speak

12   anonymously to enable plaintiff to proceed on its defamation claim.

13        And, in any event, the complaint also fails to state a claim for defamation, on its face and

14   considered in conjunction with the video itself.  First, although Paul and Paul Committee are

15   unquestionably public figures, the complaint does not allege that any false statements were made

16   **about them** with actual malice.  Instead, the complaint alleged only that the statement was made with

17   "common law" malice—"malice, hatred and ill will toward Plaintiff and the desire to injure Plaintiff."

18   But such allegations are not sufficient to alleged reckless disregard of probable falsity, which is the

19   actual malice standard.  *Solano v. Playgirl*, 292 F.3d 1078, 1084-1085 (9th Cir. 2002);  *Harte-Hanks*

20   *Communications v. Connaughton*, 491 U.S. 657, 666 n. 7 (1989).

21        Moreover, although the complaint makes the constitutionally-required allegation of factual

22   falsity—that the video's expression of a constitutionally protected opinion "Vote Ron Paul" implies

23   that Paul himself or his official campaign committee issued the video—that fact implies nothing of

24   the kind.  Polling data, not to speak of votes already cast in Iowa, New Hampshire and South

25   Carolina, suggest that there are thousands of Americans apart from Ron Paul and his official

26   committee who harbor the opinion that voters should support Mr. Paul; consequently, the mere

27   expression of the opinion does not imply that it is Ron Paul or his campaign that is speaking.

28                                         -17-

1    If anything, the final screen of the video implies that it is one of Paul's many political

2    supporters who created the video; the screen name NH4LibertyPaul implies that it is one of his New

3    Hampshire supporters who posted the video.  But that is not the same as an implication that it was

4    Paul's official campaign committee that took these actions.  Consequently, the alleged defamatory

5    statement—that a Paul supporter was responsible for the video and its posting—is not "of and

6    concerning" the organizational plaintiff in this case, as the First Amendment requires.  *New York*

7    *Times v. Sullivan*, 374 U.S. 254, 288 (1964); *Steam Press Holdings v. Teamsters Local 996*, 302 F.3d

8    998, 1004 (9th Cir. 2002).

9    For these reasons, the complaint does not state a defamation claim on which relief can be

10    granted, and Paul Committee cannot succeed in meeting the third part of the *Dendrite* / *Highfields*

11    test.

12    **4.    Plaintiff Has Not Produced Sufficient Evidence to Show That It Can Succeed on
       the Merits of Its Claim.**

13

14    Even if the Court concludes in considering some future motion from plaintiffs that the

       conclusory uses of the word "commercial" in the complaint meet a motion to dismiss standard, that

15    conclusion wold still be insufficient to justify discovery under *Dendrite* / *Highfields* absent evidence

16    supporting the allegations.  No anonymous speaker should be subjected to compulsory identification

17    through a court's subpoena power unless the plaintiff produces sufficient evidence supporting each

18    element of a cause of action to show a realistic chance of winning a lawsuit against that defendant.

19    This requirement has been followed by every state appellate court and every federal district court that

20    has addressed the standard for identifying anonymous Internet speakers, because it prevents plaintiffs

21    from being able to identify critics simply by filing facially adequate complaints.

22    Plaintiffs often argue that they need to identify the defendants simply to proceed with their

23    case.  However, no relief is generally awarded to plaintiffs until they come forward with **evidence** in

24    support of their claims, and the Court should recognize that identification of otherwise anonymous

25    speakers is a major form of relief in cases like this.  If nothing else, the identity of the video's author

26    and poster will provide grist for plaintiff's campaign mill.  And requiring actual evidence to enforce

27

28    -18-

1    subpoenas is particularly appropriate where the relief itself may undermine, and thus violate,

2    defendants' First Amendment right to speak anonymously.

3        The only evidence available to the Court is the video itself (supplied by defendant) and the

4    affidavit of Paul's campaign manager, Jesse Benton.  Neither the video nor the affidavit contains any

5    evidence supporting a prima facie case on the "commercial use" requirement for both the

6    infringement and the false advertising claim, or the "commercial advertisement," "commercial

7    injury," and "direct competitor" elements of the false advertising claim.  And although Benton's

8    affidavit makes reference to the likely confusion issue, he avers only that the text in the video

9    "thereby falsely imply[ies] that Plaintiff created, endorsed or is affiliated in some way with the Video

10   and its content." Because the video is in the record, the Court can examine it and see that there is no

11   such implication.  Moreover, the cause of action for false advertising has an additional requirement:

12   the plaintiff must allege **either** that the defendant's statements are literally false, or that any

13   misleading statements actually deceived consumers.  *Southland Sod Farms v. Stover Seed Co.*, 108

14   F.3d 1134, 1139-1140 (9th Cir. 1997); *Sandoz Pharmaceuticals Corp. v. Richardson-Vicks*, 902 F.2d

15   222, 228-29 (3d Cir. 1990).  Here, there is no literal falsity, and there is no evidence that consumers

16   were actually confused.

17       Similarly, the evidence does not create a prima facie case of defamation, even if the Court

18   reaches that issue despite the absence of a viable trademark claim.  There is no showing that the

19   implication that the video's author is a supporter of Mr. Paul's candidacy is false.   Nor is there any

20   showing that the video makes any statement "of and concerning" Paul Committee.  Moreover,

21   California law requires proof of actual damage to a defamation plaintiff, *Global Telemedia Int'l v.*

22   *Doe 1*, 132 F. Supp.2d 1261, 1266, 1270 (C.D. Cal. 2001), but there is no evidence of damage here.

23   Consequently, there is no reason to believe that a defamation claim in this case could succeed.

24       **5.   The Balance of Interests Tips Decidedly in the Does' Favor.**

25       Even if Paul Committee had presented enough evidence to warrant identifying defendants,

26       [t]he final factor to consider in balancing the need for confidentiality versus discovery
         is the strength of the movant's case . . ..  If the case is weak, then little purpose will

27       be served by allowing such discovery, yet great harm will be done by revelation of

28                                                   -19-

> privileged information. In fact, there is a danger in such a case that it was brought just to obtain the names . . . .. On the other hand, if a case is strong and the information sought goes to the heart of it and is not available from other sources, then the balance may swing in favor of discovery if the harm from such discovery is not too severe.

*Missouri ex rel. Classic III v. Ely*, 954 S.W.2d 650, 659 (Mo. App. 1997).

Similarly, *Dendrite* called for such individualized balancing when the plaintiff seeks to compel identification of an anonymous Internet speaker:

> [A]ssuming the court concludes that the plaintiff has presented a prima facie cause of action, the court must balance the defendant's First Amendment right of anonymous free speech against the strength of the prima facie case presented and the necessity for the disclosure of the anonymous defendant's identity to allow the plaintiff to properly proceed.

775 A.2d at 760.

Judges in this district have repeatedly endorsed this fifth stage of the *Dendrite* test, as in *Art of Living* and *Highfields*.

A standard comparable to the test for grant or denial of a preliminary injunction, where the court considers the likelihood of success and balances the equities, is particularly appropriate because an order of disclosure is an injunction—not even a preliminary injunction.  In every case, a refusal to quash a subpoena for the name of an anonymous speaker causes irreparable injury, because once speakers lose anonymity, they can never get it back.  But denial of a motion to identify the defendant based on either lack of sufficient evidence or balancing the equities does not compel dismissal of the complaint.  Plaintiffs can renew their motions after submitting more evidence.  Moreover, the inclusion of a balancing stage allows Does to show that identification may expose them to significant danger of extra-judicial retaliation.  In that case, the court might require a greater quantum of evidence on the elements of plaintiff's claims so that the equities can be correctly balanced.

This case presents a striking example of the importance of the balancing stage of the *Dendrite* analysis.  The speech at issue is core political speech, to all appearances from individuals who have an opinion about the presidential race; consequently, the interest of the Does in protecting their right to engage in this speech, anonymously or otherwise, is at its apogee.  And given the intensified attack culture that increasingly applies to public debate, the individuals involved with this video have every

-20-

1   reason to be concerned about the consequences of being identified as the authors of this video.  Two

2   different presidential candidates, Jon Huntsman and Ron Paul, have already denounced the video, and

3   many expressions of anger about the video have been posted online by various supporters.  Once

4   identified, the Does may face personal attacks from the candidates' supporters as a result of their

5   authorship.  Nor is this is a context in which Congress and the FEC have acted to assert a public

6   interest in requiring the public disclosure of sponsorship of the communication, as they have done for

7   paid political advertisements and contributions to or expenditures by political committees.

8          Moreover, Paul Committee does not have a strong interest in finding out who issued the video,

9   precisely because it had no right to prevent members of the public from expressing their support for

10  their candidate, or opposition to rival candidates, just because the reasons are anathema to Mr. Paul.

11  To be sure, if the makers of the video had expressly misrepresented the video as coming from Paul

12  Committee, plaintiff would have an understandable interest in correcting that false statement of fact.

13  And if the makers had violated disclosure or disclaimer laws or regulations promulgated by the FEC

14  with congressional authorization, there could be a public interest in disclosing their identities.  At

15  best, however, plaintiff must rely here on the fact that some members of the public may hold a

16  candidate in some way responsible for things his supporters say.

17         In the end, Paul Committee has no way of knowing whether this video was issued by a Paul

18  supporter with bad judgment, by a Huntsman supporter hoping to use reverse psychology to gain

19  sympathy for his candidate, or by a supporter of neither candidate who might want to criticize both

20  candidates or to make a satirical point about negative advertising.  Whatever the underlying motive

21  of the video maker and poster, plaintiff has no right to state power to obtain subpoenas to identify the

22  videographer and ascertain her motives.

23  **D.    The Court Should Address Plaintiff's Failure to Cite Contrary Authority In
        Arguing for Early Discovery, Which Was Improper in the Context of an Ex
24      Parte Motion.**

25         Unfortunately, plaintiff's ex parte motion for expedited discovery cited several appellate cases

26  as supporting early discovery, without acknowledging that they had nothing to do with anonymous

27  speech—each of them involved pro se prisoners who sought early discovery to identify defendants

28                                                  -21-

1   who had participated in alleged police brutality or prison mistreatment.  It then cited and attached a

2   stack of unreported orders allowing early discovery to identify anonymous Internet users who had

3   used file-sharing software to download copyrighted sound recordings.  But it made no mention of the

4   several cases from this District, and the many cases from other federal districts and state appellate

5   courts around the country holding that a plaintiff who seeks to identify anonymous Internet speakers

6   needs to make a preliminary factual and legal showing of merit.  Although decisions by one district

7   judge are not "controlling authority," in the circumstances, plaintiff presented a misleading picture

8   of the relevant precedents, perhaps recognizing that the ex parte nature of the proceeding might result

9   in an order allowing discovery without anybody presenting contrary authority to the Court.  Moreover,

10  plaintiff made no mention of controlling Ninth Circuit authority that, in light of the patently non-

11  commercial nature of the video in question, precludes plaintiff's trademark claims.

12          When, as here, a party seeks ex parte relief, it has a special obligation to bring potentially

13  adverse facts and authority to the Court's attention.  *Maine Audubon Soc. v. Purslow*, 907 F.2d 265,

14  268-269 (1st Cir. 1990) ("Where counsel appears ex parte ... the customary checks and balances do

15  not pertain—and the court is entitled to expect an even greater degree of thoroughness and candor

16  from unopposed counsel than in the typical adversarial setting."); *Jorgenson v. County of Volusia*,

17  846 F.2d 1350, 1352 (11th Cir. 1988); *Noble Resources Pte. v. Metinvest Holding*, 622 F.Supp.2d 77,

18  83 n.9 (S.D.N.Y. 2009); *U.S. v. Toader*, 582 F.Supp.2d 987, 991 (N.D. Ill. 2008); *Eagan by Keith v.*

19  *Jackson*, 855 F. Supp. 765, 790 (E.D. Pa. 1994) ("Candor to the Court, though desirable under any

20  circumstance, is mandated in ex parte proceedings, where the Court is deprived of the benefits of the

21  'dialectic of the adversary system.'"); *Cedar Crest Health Center v. Bowen*, 129 F.R.D. 519, 525

22  (S.D. Ind. 1989).

23          Regrettably, as the national consensus approach to discovery seeking to identify anonymous

24  Internet speakers has gained support in state after state, amici have seen a number of similar ex parte

25  motions from plaintiffs seeking early discovery.  Plaintiffs seem to count on the possibility that the

26  court, seeing an unopposed motion that seems legitimate on its face, may allow discovery that can

27  sometimes lead to the disclosure of a speaker's identity before the speaker has had any chance to

28                                              -22-

1    protect her rights.  In some cases, disclosures have led to significant extra-judicial consequences for

2    the Does.   Sometimes disclosure occurs without opposition because the ISPs release information in

3    response to subpoenas without giving any notice to their users.  Sometimes the disclosure occurs

4    because the notice is ineffective; and sometimes it is because the Does cannot afford to hire lawyers

5    to file a motion to quash, especially if the court is thousands of miles away.

6          These unfortunate practical realities make it critical that the Court clarify its existing decision

7    to conform both to the national consensus standard and to the decisions of other courts in this district.

8    If the Court's existing decision is not clarified, future plaintiffs seeking ex parte discovery in this

9    district to identify their critics will have every right to cite that decision as setting a motion to dismiss

10   standard, and to ignore the wealth of contrary authority.  And because so many hosts of Internet

11   speech are amenable to process in this District, the Court's ruling could have a serious chilling effect

12   on free speech throughout the United States and indeed throughout the world.

13         Particularly given the striking weakness of the ex parte motion filed in this case, and indeed

14   the fact that this lawsuit is utterly devoid of merit, amici urge the Court to address this issue in a

15   clarified ruling on the motion for early discovery.  The Court should remind lawyers that in filing such

16   ex parte motions, they must acknowledge cases from the Ninth Circuit and Northern District on the

17   subject, so that the judge receiving the ex parte papers can fairly decide whether to apply that case

18   law, and, if so, whether the standards of those cases have been met.

19                                            **CONCLUSION**

20         The January 25 ruling on the motion for leave to take early discovery should be clarified.

21                                     Respectfully submitted,

22                                      /s/ Scott Michelman
                                       Paul Alan Levy (DC Bar No. 946400)
23                                     Scott Michelman (Bar No. 236574)

24                                     Public Citizen Litigation Group
                                       Email: smichelman@citizen.org
25                                     1600 20th Street N.W.
                                       Washington, D.C. 20009
26                                     Telephone: 202/588-1000
                                       Facsimile: 202/588-7795

27

28                                            -23-

1

                                   /s/ Matthew Zimmerman
2
Matthew Zimmerman (Bar No. 212423)

3
mattz@eff.org
Electronic Frontier Foundation
454 Shotwell Street
4
San Francisco, CA 94110
Telephone: 415/436-9333 x127
5
Facsimile: 415/436-9993
www.eff.org
6
               /s/   Aden J. Fine
7
Aden J. Fine (Bar No. 186728)

8
afine@aclu.org
American Civil Liberties Union Foundation
9
125 Broad St., 18th Floor
New York, New York 10004
10
Telephone: 212/549-2693
Facsimile: 212/549-2654
11

January 27, 2012                           Attorneys for Amici Curiae
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
-24-